Filed 2/27/15  P. v. Barber CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DUPREE PIERRE BARBER,<br><br>     Defendant and Appellant. | C074648<br><br>(Super. Ct. No. 12F00668) |

In this matter involving a recently laid-off employee charged with murdering his boss, a jury convicted defendant Dupree Pierre Barber of first degree murder with two special circumstances (lying-in-wait and shooting from a car), shooting at an occupied car, and firearm possession by a felon.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(15), (21), 246, former 12021, subd. (a)(1).)[1]

---

[1]  Undesignated statutory references are to the Penal Code.

Sentenced to life without parole (LWOP), plus other sentences, defendant raises on appeal, among other issues, several evidentiary rulings, a couple of instructions, and the constitutionality of the LWOP sentence. We shall strike a presentence investigation/report cost order, but otherwise affirm the judgment. We also order the correction of the abstract of judgment.

## FACTUAL BACKGROUND

The homicide victim was Steven Ebert, park maintenance superintendent of the Cordova Recreation Park District (the District). A member of Ebert's staff, Scott Norton, a park maintenance supervisor, entered the park a little after 6:00 a.m. on January 23, 2012, as was his daily routine. As Norton drove into the park, he saw a medium-sized, light-colored SUV-type vehicle with dark fender wells heading out. He noticed the vehicle because it was driving fairly fast for the rainy weather that morning. As he continued toward the maintenance shop, he saw a car stopped on the road ahead with its lights on. As he drove by, he saw that the driver's side window was broken and mostly gone, so he stopped to investigate. He found Ebert's body slumped in the driver's seat of his bullet-riddled car. There were a handful of bullet holes in the driver-side door. Norton immediately called 911.

Around 11:00 a.m. the same day, police responded to an abandoned vehicle call and found a silver Saturn Vue, which is a compact SUV (hereafter SUV), with damage on its right rear side and a right rear flat tire, about a half-mile from the shooting site. Undisputed evidence showed that defendant had purchased the SUV on January 18, 2012, by putting its entire $9,000 cost on his American Express credit card—he made this purchase just days after losing his job as a park maintenance worker at the District on January 12, 2012, and just days before the shooting on January 23. The SUV contained identification papers for defendant, and a District jacket with defendant's identification

2

badge in one of its pockets. Furthermore, damaged, broken-off car parts that were found next to a tree about 100 yards from Ebert's car were matched to the SUV's damage.

Three latent fingerprints of defendant's were found on the SUV's exterior driver's door.

A .357 revolver was found on the rear floorboard of the SUV. There were six casings within the cylinder that had all been fired. No expended casings were found at the shooting scene, indicating a revolver had been used.

The SUV's front passenger visor had a hole in it. Gunshot residue tests disclosed that the front passenger headliner in the SUV's interior was near the muzzle of a firearm during a bullet discharge.

An autopsy disclosed that Ebert died of multiple gunshot wounds to the torso, sustaining five separate gunshot wounds to his left side. The pathologist opined that these shots were fired through something, like glass or metal.

And ballistics evidence disclosed that the revolver found in the SUV had fired a bullet extracted from Ebert during the autopsy.

Defendant angrily protested the District's decision to lay him off in January 2012. He had a long, well-documented, contentious relationship with the victim, Ebert, the park maintenance superintendent. In 2008, defendant filed an administrative complaint with California's Department of Fair Employment and Housing alleging harassment and discrimination by Ebert and others; and, in 2009, he followed this with a similar judicial lawsuit (adding retaliation as well), which the parties agreed to dismiss at the end of 2010, with no monetary award and each side paying its own costs and attorney fees.

Defendant was arrested the day after the shooting, January 24, 2012, after calling the police to report that he had been in a fight, and that a friend said he might be wanted (although defendant did not know why).

3

A subsequent search of defendant's Nissan car disclosed a sealed envelope containing his passport, Social Security card, and birth certificate.

Defendant testified he had no reason to kill Ebert because he had another full-time job with Aerojet as a janitor. He also had a job offer from a friend in West Virginia. He bought the SUV to drive back there, and he left his important papers in his Nissan so his sister could retain them while he moved. He concocted the story to the police about being in a fight because a friend had informed him that someone had been killed on the job and police wanted to talk with those who had been laid off; if defendant had mentioned the killing, the police would have come at him with guns drawn.

## DISCUSSION

## I. Evidence Found in the Nissan

After arresting defendant, the police wanted to find and search his Nissan.

It is undisputed that the police violated defendant's *Miranda*[2] rights in questioning him about the Nissan's location. The police ignored defendant's invocation of counsel, and prodded him to divulge the car's location by warning him that his family risked a gun-drawn felony vehicle stop if they traveled in that car.

The trial court denied defendant's motion to suppress the Nissan evidence (as noted, the car contained a sealed envelope with defendant's passport, Social Security card, and birth certificate). The court did so on the ground the police inevitably would have discovered the car (and the evidence it contained) pursuant to leads independent of defendant's *Miranda*-violative statement. These leads included contact with defendant's family members and evidence disclosing cell phone locations. (*In re Angel R.* (2008)

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436, 474 [16 L.Ed.2d 694].

4

163 Cal.App.4th 905, 909-910 [inevitable discovery is a proper ground for denying a *Miranda*-based motion to suppress].)

Defendant contends the trial erred in denying his suppression motion on the ground of inevitable discovery. There is no need to analyze whether the trial court erred in this regard. We can proceed straight to the issue of prejudice, because clearly there was none here. Assuming, then, merely for the sake of argument, that the trial court did err in denying defendant's motion to suppress the Nissan evidence, any such error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

To describe the evidence against defendant—leaving aside the evidence found in his Nissan—as overwhelming, is an understatement. There is the evidence surrounding the SUV—Norton's apparent view of it fleeing the shooting scene; also, its matching damage, its purchase details, its identification with defendant, its latent prints, its gunshot residue, and its revolver encompassing the ballistics evidence. Then we have defendant's strong motive, arising from a long-standing and contentious history with the victim, Ebert, punctuated by defendant's layoff just days before the shooting. Moreover, as a District employee, defendant would have known that Ebert routinely arrived at the site of the shooting each workday morning at 6:00 a.m. Finally, although the Nissan evidence inferred that defendant intended to flee after the shooting, the probative value of this evidence, as the People point out, was diminished by defendant's decision essentially to surrender to the police the day after the shooting.

We find no prejudicial error regarding the admission of the Nissan evidence.

5

## II. Legal Filings and Ebert's Statements of Fear

Defendant contends the trial court erred in admitting into evidence (1) defendant's administrative agency complaint and judicial lawsuit to show motive, and (2) Ebert's statements that defendant might be dangerous.

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) We see no abuse here.

As for the legal filings, as noted, defendant filed an administrative complaint with the Department of Fair Employment and Housing in 2008 against Ebert, among other District personnel, for discrimination and harassment; and followed this in 2009 with a similar judicial lawsuit (adding retaliation as well). Defendant principally objected that this evidence was irrelevant and too remote in time. The relevance is obvious: defendant's motive for shooting Ebert. As for remoteness, the shooting took place at the beginning of 2012. These legal actions culminated with a dismissal at the end of 2010 (essentially adverse to defendant). Thus, the shooting occurred only one year after the legal actions ended; the trial court did not abuse its discretion in rejecting defendant's remoteness claim.

As for Ebert's statements of dangerousness, they were part of the evidence of the long-standing contentious relationship between Ebert and defendant evidenced by the District's human resources personnel. In January 2009, and again in November 2009, Ebert expressed concern that defendant could be dangerous.

Evidence Code section 1250 allows the admission of a trustworthy statement of a declarant's then existing state of mind or emotion if offered to prove or explain conduct of the declarant. (See Evid. Code, § 1252 [circumstances indicating lack of trustworthiness].) Ebert's statements of defendant's dangerousness were admitted as indications of Ebert's state of mind or emotion regarding defendant to explain Ebert's

6

conduct—i.e., believing defendant could be dangerous, Ebert would not have stopped his car to talk to defendant on the morning of the shooting (had he known the newly purchased SUV was defendant's car); this tended to show the special circumstance that defendant was lying-in-wait for Ebert. Coupling this basis of admission with the fact that Ebert's two challenged statements were made in the course of a meeting and an investigation documented by the District's human resources department—i.e., circumstances indicating trustworthiness—we conclude the trial court did not abuse its discretion in admitting them.[3]

Lastly, because we have concluded the trial court properly admitted the legal filings and Ebert's statements of dangerousness under state evidence law, we reject defendant's additional claim that their admission deprived him of due process and a fair trial.

### III. Three Excluded Lines of Defense Evidence

Defendant claims the trial court erred in excluding three key lines of defense evidence, denying him his constitutional rights to a fair trial.

Again, we review a trial court's evidentiary rulings for abuse of discretion. (*Guerra*, *supra*, 37 Cal.4th at p. 1113.) Addressing the three evidentiary lines in turn, we see no abuse here.

**(1)** Defendant contends the trial court erred in excluding a statement from another District employee, Kenneth Marks, which stated, " 'If I get laid off I'm going to come back and shoot somebody.' " Defendant offered this evidence to show the police

---

[3] Any alleged failure by defense counsel to request a limiting instruction concerning these challenged statements was harmless for the reasons expressed in part I. of the Discussion, *ante*.

improperly focused on defendant to the exclusion of others, and that defendant was not the only disgruntled District employee.

As the trial court correctly observed, defendant wanted to show that the police "failed to investigate third party culpability, [a]nd, because of that, the third party culpability . . . rules of admissibility . . . govern."

Third party culpability evidence is admissible if it is capable of raising a reasonable doubt of defendant's guilt. (*People v. Hall* (1986) 41 Cal.3d 826, 833.) "[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*)

Defendant did not offer any direct or circumstantial evidence linking District employee Marks to the *actual* perpetration of the offenses here. Consequently, the trial court did not err in excluding Marks's statement.

**(2)** For similar reasons, we conclude the trial court did not err in excluding evidence, under Evidence Code section 352 (probative value outweighed by prejudicial effect, jury confusion, or time consumption), that two other District employees (neither of whom was Marks) had filed discrimination lawsuits against the District similar to defendant's, and around the same time.

**(3)** Lastly, the prosecution sought admission of District employee Scott Norton's full 911 call at the scene of the shooting, to characterize the hateful relationship between defendant and Ebert; in that call, Norton disclaims wanting to speculate, notes the District recently laid off a few people, but acknowledges that the only person who comes to mind as responsible for the shooting is defendant. In light of the prosecution's offer of proof,

8

defendant too sought the call's admission so he could examine why Norton picked him, which, defendant believed, was racially motivated.

We think the trial court, on its own initiative, struck the right balance, again under Evidence Code section 352, in excluding this evidence, the foundations of which were grounded in speculation from both sides.

Given this reasoning and these conclusions, we also reject defendant's constitutionally based (unfair trial) claims regarding these three lines of evidence.

## IV. Two Unsanitized Felony Domestic Assault Convictions to Impeach Defendant, and Sua Sponte Duty to Instruct Thereon

Defendant contends the trial court erred in admitting into evidence, to impeach him, two felony "domestic assault" convictions, one from 1996 and the other from 1998. Defendant urged the trial court to exclude the older conviction, and to sanitize the more recent one by referring to it only as a felony of moral turpitude.

As defendant's argument concedes, these two felony domestic assault convictions were crimes of moral turpitude. Thus, they met the threshold requirement for impeachment admissibility. (*People v. Castro* (1985) 38 Cal.3d 301, 314-316.)

But even if we were to assume for the sake of argument that these offenses were too remote, too unrelated to credibility, and "two" many, we would not reverse. This is because the evidence against defendant, as summarized in part I. of the Discussion, was overwhelming, and because the trial court effectively instructed the jurors that they could consider these offenses "only for [the] purpose" of "evaluating the credibility of the witness's testimony." (CALCRIM Nos. 315, 316.) It is not reasonably probable that defendant would have fared better had these two convictions not been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [setting forth this standard of harmless error for state law errors].)

To the extent defendant raises constitutionally based unfair trial claims involving this evidence, we reject those claims too. Absent *fundamental unfairness*, state law error in admitting evidence is subject to the traditional *Watson* test. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The admission of these two convictions for impeachment purposes did not implicate fundamental unfairness.

In a related contention, defendant claims the trial court should have instructed on its own initiative (sua sponte) that the jury could not use these offenses to determine that defendant was a bad character or had a criminal propensity. As noted, the limiting instructions the trial court gave the jurors effectively told them they could use this prior crimes evidence "only for [the] purpose" of evaluating witness credibility. "It is axiomatic that '[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502.) Consequently, we reject this contention.

## V. CALCRIM No. 362

The trial court instructed the jury with CALCRIM No. 362. That instruction essentially stated that if defendant, prior to trial, made an intentionally false or misleading statement relating to the charged crime, then the jury could, but need not, consider the statement in determining guilt and that such a statement could not prove guilt by itself. Apparently, this instruction was directed to defendant's statement to the police that he was turning himself in for a mere fight.

Defendant argues the trial court erred in giving this instruction, because he (defendant) rationally explained why he made this statement—he feared facing headlong armed officers if he said he had a murder warrant; thus, the statement was not intentionally false or misleading.

10

Assuming for the sake of argument (1) that this instruction affects defendant's substantial rights (§ 1259), so his failure to object to it does not mean he has forfeited this contention, and (2) that the trial court erred in giving this instruction, we would not reverse. Again, we direct the reader to the harmless error analysis set forth in part I. of the Discussion. We further note that this instruction did not render the trial *fundamentally unfair*, so the assumed error does not rise to constitutional due process levels; the traditional *Watson* standard of harmless error applies (i.e., reasonable probability of better result absent the error). (See *People v. Partida*, *supra*, 37 Cal.4th at p. 439 [absent fundamental unfairness, state law error is subject to the traditional *Watson* test]; see also pt. IV. of the Discussion, *ante*.)

## VI. Constitutional Considerations for Distinguishing Lying-in-wait Special Circumstance

Defendant claims "the lying-in-wait and drive-by special circumstances were unconstitutionally applied in a vague and arbitrary manner that failed to explain or narrow LWOP or death eligibility (versus first degree murder) in any rational way."

Preliminarily, we note the trial court explicitly used only the lying-in-wait special circumstance to impose LWOP. We also note that the California Supreme Court, in *People v. Morales* (1989) 48 Cal.3d 527, has effectively rejected defendant's constitutional claim as it pertains to the lying-in-wait special circumstance. (*Id.* at p. 557, disapproved on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.) We are bound by *Morales*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Consequently, we reject this claim.

## VII. Cumulative Error

Having found, at most, three assumed but harmless errors, we reject defendant's claim of prejudicial cumulative error.

11

## VIII.  Section 654—Felon Firearm Possession

Defendant contends the trial court erred in imposing a three-year consecutive sentence for defendant's conviction for firearm possession by a felon (count three— former § 12021, subd. (a)(1)), rather than staying such sentence under section 654. Defendant claims there was insufficient evidence he possessed the gun separately from the murder and drive-by shooting offenses.  We disagree.

Section 654 proscribes multiple punishment not only for one act, but for multiple offenses which are committed in a single transaction incident to a single intent and objective.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)  We uphold a trial court's factual finding regarding whether a defendant had separate intents and objectives if the finding is supported by substantial evidence.  (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

We agree with the section 654-restrictive test set forth in *People v. Jones* (2002) 103 Cal.App.4th 1139.  That test forecloses section 654 applicability, in the context of firearm possession by a felon, if there is any evidence the felon possessed the firearm before or after the primary crime, thus evidencing an independent possessory intent.  (*Id.* at pp. 1144-1146.)  The reason for this test is simple:  The felon firearm possession offense is committed the instant the felon in any way has a firearm within his control. (*Id.* at pp. 1145-1146.)  There's no need to split section 654 hairs for the benefit of felons and firearms.  The two should not mix.  Applying the stringent test in *Jones* helps keep them apart.

Here, there is evidence that defendant arrived at the shooting scene with the firearm in tow, as well as evidence that he possessed the gun after committing the shooting.  Accordingly, the trial court acted properly in not staying under section 654 the sentence imposed for the felon firearm possession conviction.

12

## IX. Presentence Investigation/Report Costs

Defendant contends the trial court erred in ordering him to pay, absent evidence of an ability to pay, $702 for costs of a presentence investigation and report.  By not objecting to this order, defendant has forfeited this contention.  (*People v. McCullough* (2013) 56 Cal.4th 589, 597; *People v. Snow* (2013) 219 Cal.App.4th 1148, 1151.)

Anticipating this forfeiture, defendant also argues that if defense counsel failed to preserve this issue then counsel rendered ineffective assistance.

So as not to second-guess a defense counsel's actions or inactions in the heat of trial, we reject claims of ineffective assistance on appeal, in silent record cases, such as this one, if there is a conceivable tactical reason for them.  (*People v. Frye* (1998) 18 Cal.4th 894, 979, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)  The People offer two reasons for defense counsel's failure to object to the challenged cost order:  (1) The trial court offered defendant the chance to contest these costs by subsequent motion; and (2) defense counsel reasonably may have believed that defendant's LWOP sentence afforded the time to pay these costs through prison work wages.

Reason (1) does not demonstrate effective assistance because defense counsel did not make such a motion, thereby again failing to preserve the issue and dropping us back where we began.  And reason (2) does not help in this way either.  That is because, by statute, a court cannot consider a period greater than one year for purposes of determining future financial ability to pay these costs.  (§ 1203.1b, subd. (e)(2).)  Thus, it cannot be said that counsel rendered effective assistance by failing to object to the imposition of the $702 for costs.

A remand for further proceedings on this question would consume more time and public dollars than it is worth; as such, it is an " 'idle gesture.' "  (*People v. Terrell* (1999) 69 Cal.App.4th 1246, 1255-1256; see also Civ. Code, § 3532 ["The law neither

does nor requires idle acts"].)  The best thing to do at this point is to preserve the public fisc, and simply strike the presentence investigation/report cost order, which we do.  As this cost does not appear on either the determinate or indeterminate abstract of judgment, no amendment to the abstract is ordered on this point.

### X.  Abstract of Judgment

Defendant correctly notes that item 6b of the amended indeterminate abstract of judgment improperly imposes a term of 25 years to life for his murder conviction *in addition to* his LWOP term for that conviction (item 4); LWOP is an *alternate* term for murder, *in lieu of* a 25-year-to-life term for that offense.  (Pen. Code, § 190, subd. (a).)  This error is contrary to the trial court's oral pronouncement of judgment.  We will direct the trial court to make this correction.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 187-188.)

### DISPOSITION

The $702 presentence investigation/report cost order is stricken.  As so modified, the judgment is affirmed.  The trial court is directed to correct the amended indeterminate abstract of judgment by deleting the imposition of 25 years to life on count one (i.e., uncheck item 6.b.), and to send a certified copy of this corrected abstract to the Department of Corrections and Rehabilitation.


          BUTZ        , J.

We concur:


    BLEASE    , Acting P. J.


    HULL    , J.

14